IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2018

**STATE OF TENNESSEE v. TORAN HARPER**

**Appeal from the Criminal Court for Shelby County**
**No. 15-04996       Lee V. Coffee, Judge**

_____

**No. W2017-00875-CCA-R3-CD**

_____

A Shelby County Criminal Court Jury found the Appellant, Toran Harper, guilty of first degree premeditated murder, felony murder, attempted especially aggravated robbery, aggravated robbery, and being a felon in possession of a weapon. The trial court imposed a total effective sentence of life plus seventy-five years. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions, alleging that inconsistencies in the witnesses' testimony raise reasonable doubt of his guilt. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

J. Shae Atkinson (on appeal) and Juni S. Ganguli (at trial), Memphis, Tennessee, for the Appellant, Toran Harper.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Chris Lareau, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The Appellant was indicted on one count of first degree premeditated murder, one count of felony murder, and one count of attempted especially aggravated robbery of the

victim, Kendrick Marr. Additionally, he was indicted on one count of aggravated robbery of Frederick Marr[1] and one count of being a felon in possession of a weapon.

Regarding the charge of being a felon in possession of a weapon, the parties stipulated at the beginning of the trial that as of the date of the instant offenses, the Appellant "had previously been convicted . . . of five (5) felonies all involving the use or attempted use of violence." Additionally, the parties stipulated that the Appellant "was on notice that it was illegal for him to own, possess or handle a firearm."

Frederick Marr, the victim's cousin, testified that on the night of February 28, 2015, he picked up the victim at a friend's house, and they went to a party. During the party, the victim received several telephone calls. Marr and the victim left the party in a white Nissan Altima and went to Dee's gas station on Lamar Avenue. Marr drove, and the victim was in the front passenger seat. Marr knew they were going to meet the person who had called the victim, but Marr did not know the identity of the caller.

The men arrived at the gas station around midnight or 12:20 a.m., and Marr parked beside a gas pump. Approximately one minute later, two women, whom Marr later identified as Tonisha Thompson and Gabrielle McNeil, arrived and got into the back seat of the Altima. The victim spoke with the women; however, Marr could not hear their discussion because the radio was too loud.

Marr saw the victim pass some pills to the women but did not know if the victim was selling or giving them the pills. About one minute later, a man jumped into the back seat of the car, and the women immediately jumped out of the car. Marr thought the women and the man, whom Marr later identified as the Appellant, "had to be together." When Marr and the victim tried to follow the women, the Appellant warned them not to get out of the car. Marr said that the lights at the gas station were bright, that he could see the Appellant, and that he had never seen the Appellant before that night. The Appellant pointed a gun, which appeared to be a .9 millimeter or a .45 caliber, at Marr and the victim and demanded, "Drop it off. Give me everything you got in your pocket." Marr and the victim first told the Appellant they did not have anything. The Appellant hit the victim in the head with the butt of the gun and again demanded money. Marr gave the Appellant all of the money in his pockets, which was approximately $90 to $95, hoping the Appellant would leave them alone. However, the Appellant continued to hit the victim in the head and demand money. After being struck in the head three to five times, the victim "turned around and started tussling with" the Appellant and insisting he did not have any money.

---

[1] For clarification, because these individuals share a last name, we will refer to Kendrick Marr as "the victim" and to Frederick Marr as "Marr."

- 2 -

The Appellant warned the victim, "If you keep on tussling with me, I'm going to shoot you." Nevertheless, the victim kept fighting the Appellant, and the Appellant shot him. Marr did not know where the bullet struck the victim. Immediately after the shooting, all three men got out of the car. The Appellant ran away, and the victim and Marr walked to the front of the car. Marr ran to the store for help. He saw people inside the store, but the door had been locked. Marr assumed the people in the store had locked the door because of the shooting. Marr turned around, saw the victim lying on the ground, and called the police for help. He then retrieved the pill bottle from the car and threw it away. He explained that he thought the bottle might have the victim's name on it.

Approximately ten to fifteen minutes after the call, the police arrived at the scene. Marr was placed in a patrol car. Sometime later, Marr went to the police station, gave a statement, and identified the Appellant from a photograph lineup. Marr was certain the Appellant was the person who shot the victim. Marr said that neither he nor the victim had a gun that evening. A security video from the gas station was shown during Marr's testimony.

On cross-examination, Marr said that he and the victim arrived at the party in east Memphis around 9:30 or 10:00 p.m. on February 28. The white Nissan Altima Marr was driving belonged to another cousin. Marr drank one to two beers at the party. After approximately two hours, Marr and the victim left the party to pick up the car's owner from work; on the way, they stopped at the gas station. Marr was not surprised when the women got into the car because the victim had been communicating with them for hours. Marr saw the victim give the women some pills and did not "see any money turning back." Marr did not think the victim was a drug dealer, noting that the victim "went to the doctor and got" the pills. Marr saw the women for less than one minute. The Appellant was in the car for approximately one to one and one-half minutes.

Marr acknowledged that after the offense, he gave a statement to the police in which he described the perpetrator as a black male who was twenty-two or twenty-three years old and was approximately 5'9" tall and 130 pounds. Marr told police that the perpetrator was wearing a light-colored hoodie, which was possibly blue. Marr identified the Appellant from a photograph lineup; however, he was unable to identify one of the women from a photograph lineup.

Tonisha Thompson testified that at the time of the offenses she had known McNeil for one year. She had known the Appellant, whom she called "Troy," for four years, and she had known the victim since she was in high school. Sometime after 5:00 p.m. on

- 3 -

February 28, 2015, Thompson; her sister, Mesha;[2] McNeil; and the Appellant were "getting high" in Mesha's room at the Days Inn on American Way. They were using Xanax pills and powder cocaine.

Later that night, while still in the motel room, Thompson and McNeil decided they wanted more pills. Thompson called the victim more than once and asked if he could "serve" them. The victim responded that he could, and they arranged to meet at Dee's gas station on Lamar Avenue. After the call, the Appellant asked the women if the victim was "the dude from Mexi Street" who had sold them pills on another occasion when the Appellant was with them, and the women confirmed that he was. The Appellant then stated that he would go with them and "just take the pills" from the victim then split the pills with Thompson and McNeil. Thompson recalled that before they left the motel to meet the victim, she saw the Appellant sitting on the couch in the motel room with "a black gun, like the police be having on TV."

Thompson said that as she, the Appellant, and McNeil, were leaving the room, the Appellant grabbed the gun from the table as he walked out. Thompson drove the Appellant's car, McNeil sat in the front passenger seat, and the Appellant sat in the back seat. During the drive, they did not discuss what they would do when they arrived at the gas station. The Appellant was the only one with a gun.

As they neared the gas station, the Appellant instructed Thompson to let him out at Liberty Inn. Thompson complied and proceeded to the gas station. Once there, she and McNeil got into the back seat of the Altima; Thompson sat behind Marr, and McNeil sat behind the victim. Thompson did not speak to Marr but told the victim she wanted to buy Xanax pills. As the women took out money to pay for the pills, the Appellant got into the back seat from McNeil's side of the car. The Appellant "wav[ed] the gun" toward the front of the car and demanded the victim and Marr give him "everything they got." Thompson said she was "shocked" because the Appellant "was waving the gun everywhere." Thompson thought the Appellant would "scare [the victim] with the gun, and just take the pills." She had not anticipated that the Appellant would demand money as well as pills.

Thompson was scared, and McNeil was confused by the Appellant's actions. The women ran to the Appellant's car, and Thompson drove down the street to Love's gas station. The Appellant called Thompson and asked her to pick him up by the butcher shop. She complied. After the Appellant got into the car, Thompson asked if he had gotten any pills. He responded that the victim "wouldn't give them up." The Appellant told them he got $70 but did not say who gave him the money.

---

[2] Initially, Thompson said Mesha was her sister then later explained that Mesha was her "play sister" and that she did not know Mesha's last name.

After the offense, Thompson drove to her cousin Dee's house. Thompson did not know the victim was dead, and she told the Appellant that she thought they should leave because the victim knew where the Appellant stayed. They left Dee's house and went to Mesha's motel room. During the drive, the Appellant had Thompson stop, and he "[d]ropped [the gun] off on Baltimore at a rooming house." Thompson said that "[e]verybody was just quiet" when the Appellant went into the house with the gun and returned without it.

Thompson said that after they got to the motel room, everyone went to sleep. Thompson was awakened the next morning at 9:00 a.m. when her mother telephoned and told her the victim had been killed at a gas station. After the call, Thompson asked the Appellant if he had shot the victim. The Appellant responded that he did not remember. Thompson did not call the police to report the Appellant's role in the shooting because she was scared of what he might do to her.

On March 3, 2015, Thompson was arrested for her role in the offenses.[3] She said that she did not tell the police the truth about the crimes immediately because she was scared. After the police told her they knew she was the last person to call the victim before his death, she told them the truth to "just get it over with." Thompson said that she wanted to testify against the Appellant and that she had not been promised anything for her testimony.

On cross-examination, Thompson acknowledged that she initially told the police she did not know the identity of the man who jumped in the back seat and demanded money from the victim.

Gabrielle McNeil testified that at the time of the offenses she had known Thompson for two years. McNeil said that around 11:00 p.m. on February 28, Thompson sent McNeil a text message asking if she "want[ed] to kick it with her that night." McNeil agreed to meet Thompson at the house of Thompson's cousin, Dee. McNeil met the Appellant, who was with Thompson, for the first time that night at Dee's house. Thompson, McNeil, and the Appellant left Dee's house and, after a brief visit with one of the Appellant's friends, went to Mesha's motel room.

While they were in the room, the Appellant and Mesha sat on a couch and talked. McNeil, who was sitting at the table, could not hear their conversation. McNeil noticed a gun on the table. Thompson asked McNeil to go with her to get some pills. McNeil

---

[3] Thompson and McNeil each were charged with one count of first degree premeditated murder, one count of felony murder, one count of attempted especially aggravated robbery of the victim, and one count of aggravated robbery of Marr.

agreed, and they went outside. Thompson volunteered to drive, and McNeil sat in the front passenger seat. The Appellant joined them and sat in the back seat.

Thompson stopped in front of a motel near the gas station, and the Appellant got out of the car. The women proceeded to the gas station and, when they arrived, parked behind a white Nissan Altima. Thompson asked McNeil to come with her to the Altima, explaining that she was uncomfortable and did not want to get into the Altima alone. McNeil agreed, accompanied Thompson to the Altima, and got into the back seat on the passenger side, and Thompson got into the back seat behind the driver. The victim asked Thompson about McNeil, and Thompson answered that McNeil was her "friend, G.G." The victim asked how many pills Thompson wanted. Thompson first inquired if McNeil wanted any pills, and McNeil said no. Thompson then began looking around, as "if somebody was coming." McNeil "didn't think anything about it" because she was "under the influence" and was "really in [her] own world," explaining that she had been "popping pills," drinking alcohol, and smoking marijuana. The victim again asked how many pills Thompson wanted, and Thompson responded that she wanted a couple of pills.

At that point, the door beside McNeil opened, and the Appellant got in the back seat. McNeil "scooted" to the middle of the back seat, "elbow[ed]" Thompson, and told her to get out of the car. McNeil saw the Appellant point a gun at Marr and the victim and heard him say, "Give me everything you got." The women ran back to their car and started driving towards Mesha's motel room. Before they arrived, the Appellant called Thompson, and Thompson turned the car around. Thompson slowed the car when she saw the Appellant running down the street, and the Appellant jumped into the back seat. Thompson asked if he had gotten pills from the victim. The Appellant responded that he had obtained only a couple of pills and approximately $80 and stated that the victim "wouldn't give it up. He wouldn't give me the pill bottle."

Thompson drove them to Dee's house. The women got out of the car, and the Appellant drove around the corner and parked the car. The Appellant walked to the side of the house, took off a "pullover or a jacket," and put the item of clothing in a garbage can. The Appellant and the women then went into the house. Thompson did not know the victim had died and was concerned the victim might come to Dee's house or call the police. After Thompson expressed her discomfort, the Appellant retrieved the car, and they left.

The Appellant stopped at a house down the street, got out of the car, and walked to the side of the house. It was dark, and McNeil did not see what the Appellant did at the side of the house. When the Appellant returned to the car, he was wearing "a different shirt or something." They drove away, stopped at a different gas station, then went to Mesha's motel room, and everyone went to sleep.

- 6 -

The next morning, the Appellant, Thompson, and Mesha woke McNeil and showed her the victim's photograph on a website. McNeil recalled that "R.I.P." was written at the top of the photograph. McNeil asked about the photograph and was told that it was "the dude that got robbed last night." The women asked the Appellant if he had killed the victim. The Appellant responded, "Man, I don't know. We was tussling in the back, and the gun shot off through the back seat. When I jumped out, he collapsed in the parking lot." McNeil was shocked to learn the victim had been shot.

McNeil said that the Appellant was supposed to take her to work the next day but that she refused to go with him and Thompson when they left the motel. She stayed in the room with Mesha for a while then spent some time with one of Mesha's friends and eventually went to her father's house. McNeil did not see the Appellant or Thompson again.

McNeil explained that she did not call the police because she was afraid. After she arrived home, she told her father what had occurred and assured him she would talk with detectives the next day. Before she could contact the police, she was arrested for her role in the crimes.

McNeil said she gave the police a truthful statement and identified the Appellant and Thompson from photograph arrays. A couple of days later, she contacted the police to make sure she had not left out any details in her statement. She asserted that she wanted to testify against the Appellant and had not been offered anything for her testimony.

On cross-examination, McNeil said that Thompson did not call or text anyone on the way to the gas station but that Thompson had been calling or texting someone earlier that night. McNeil knew Thompson was going to the gas station to get pills; however, McNeil denied knowing that Thompson had set up a "drug deal" and did not know about the plan to rob the victim.

McNeil acknowledged that she initially lied to Sergeant Wilke by saying she did not know why she had been brought to the homicide office. However, she denied lying repeatedly to the police. McNeil acknowledged that she told the police that the victim was her drug dealer and that she brought him customers in exchange for pills.

Alexis Harris testified that in the early morning hours of March 1, she and two female friends stopped for gas at Dee's Oil. After Harris exited the car, she "heard something like a tire pop." She looked over and saw two men. She ran and got into her car. When she looked towards the men again, the first man appeared to be trying to get away from another man who was holding a gun. The first man fell to the ground and

seemed to be "taking his last breath." Harris drove away from the gas station, but as she looked back, she saw the man with the gun run across Lamar Avenue. Shortly thereafter, Harris called the police and returned to the gas station to wait for the police to arrive.

On March 30, the police came to her house and showed her a photograph array, from which she chose the Appellant's photograph. She wrote on the array, "I'm not sure, but it look like the man" who had the gun.

On cross-examination, Harris said the friends she was with were Alexis Robinson and Terrica Jackson. At the scene, Harris told Sergeant J.K. Smith that they had not been drinking or smoking and that they had left her house in her black Chevrolet Aveo to go to a club. Harris did not see any women run from the victim's car around the time of the offense. She described the gunman as short, between twenty and thirty years old, and wearing a black hoodie and blue jeans. Harris said she had looked at the gunman to make sure he did not intend to shoot her car.

Terrica Jackson testified that before midnight on March 1, she, Harris, and another friend were at Harris' house and decided to go to a club. On the way, they stopped at a gas station on Lamar Avenue. Harris parked at a gas pump "on the far end" and got out of the car. Jackson heard a loud noise "like a tire had blew." Harris got in the car and said "it was a shooting." Jackson looked to the right and saw a man stumble and fall to the ground. As the women drove from the gas station, Jackson saw a man place a gun in the hoodie he was wearing. The gunman ran towards Harris' car as he was crossing the street.

Approximately thirty days after the incident, the police showed Jackson a photograph array, from which she identified the Appellant as the gunman. She noted that she "saw him enough" on the night of the offense but that she was nevertheless unsure of the identification.

On cross-examination, Jackson said that while at Harris' house, none of the women drank alcohol but that they smoked "a blunt" of marijuana. Jackson had never seen the Appellant before that night and did not see any women leaving the victim's car.

Lieutenant Chester Striplin with the Memphis Police Department testified that he was assigned to the video evidence lab and that on March 1, 2015, he went to find and retrieve video evidence of the crime scene and surrounding areas. Lieutenant Striplin watched and made copies of the gas station's security videos. From the videos, he discerned that one of the perpetrators had walked to the gas station from the Lamar Motel, which was located north of the gas station on the same side of the street. The gas station's security videos also revealed that after the offense, a silver car left the gas station and proceeded southbound on Lamar Avenue. Lieutenant Striplin went to the

motel and watched and copied their security videos. The motel security videos showed a person wearing a hoodie get out of a silver vehicle.

On cross-examination, Lieutenant Striplin stated that the crime occurred around midnight on February 28. He collected the security videos the next morning. The security videos did not show the faces of any of the people involved in the crime. On redirect examination, Lieutenant Striplin noted that because the security videos were not of "great" quality, magnifying the images on the security videos would not have helped the police discern the faces of the people involved. Lieutenant Striplin said that the clothing of the person getting out of the vehicle at the motel before the shooting was similar to the clothing of the person in the gas station video. Additionally, the time reflected on the video was consistent with the time the person was seen walking from the motel to the gas station.

Memphis Police Officer Matthew Williams testified that he was the first officer to respond to a shots-fired call at Dee's Oil on Lamar Avenue. He noted that the gas station was near the interstate. A white car with the front passenger side door open was parked at one of the gas pumps. On the other side of the gas pump, he saw the victim lying on his back on the ground. The victim had only a small amount of blood on his shirt. He was unresponsive, his eyes were rolled back in his head, and he was not breathing. Officer Williams radioed for paramedics and learned that they had already been dispatched to the scene. When the paramedics arrived, they pronounced the victim dead at the scene.

Marr was at the scene and told Officer Williams that he was the victim's cousin. Marr said that he was the driver of the white Altima and that he and the victim had come to the gas station together. Officer Williams secured Marr in the back of a patrol car. A few moments later, a vehicle occupied by three females arrived at the scene. The females stated that they had been at the gas station when the shooting occurred. Officer Williams secured the females in separate patrol vehicles.

Marcus Mosby testified that he worked with the crime scene investigation unit of the Memphis Police Department and that he was dispatched to the gas station on Lamar Avenue shortly after the shooting. When Officer Mosby arrived, he saw a white Nissan Altima "parked by pumps three and four." The body of a black male was lying on the parking lot on the other side of the pumps. Officer Mosby collected a spent .9 millimeter casing and a crushed prescription pill bottle from the parking lot. While securing the scene, three women drove into the parking lot and said they were at the gas station when the shooting occurred.

On cross-examination, Officer Mosby acknowledged that inside the pill bottle was a single pill with the word "Watson" written on it. No analysis was performed on the pill, so Officer Mosby did not know what kind of pill it was.

Sergeant John Stone, who was also a member of the crime scene investigation unit, went to the crime scene and later processed the Nissan Altima. Sergeant Stone did not recall if any spent shell casings were recovered from inside the car. No weapons or viable fingerprints were found in the car. In the front passenger door, the police found marijuana in an amount that appeared to be for personal use.

Dr. Paul Benson, the medical examiner who performed the autopsy on the victim's body, testified that a bullet entered the victim's chest under the left seventh rib and perforated the lower lobe of the left lung, the heart, the diaphragm, the lower lobe of the right lung, and the right lobe of the liver. The bullet caused a "lethal amount" of internal bleeding. The toxicology screen showed the presence of alprazolam, also known as Xanax, in an amount "consistent with . . . what you would expect for someone who is taking it as prescribed." The toxicology screen also showed low amounts of marijuana and codeine.

The Appellant chose not to testify or to put on any proof. The jury found the Appellant guilty of first degree premeditated murder, felony murder, attempted especially aggravated robbery, aggravated robbery, and being a felon in possession of a weapon. The trial court sentenced the Appellant to life for each murder conviction and merged the convictions. The trial court sentenced the Appellant as a Range III, persistent offender to thirty years for the attempted especially aggravated robbery conviction and fifteen years for the felon in possession of a weapon conviction, with release eligibility after serving forty-five percent of the sentences. Because the Appellant was a repeat offender, the trial court sentenced the Appellant to thirty years for the aggravated robbery conviction, with one hundred percent of the sentence to be served in confinement. The trial court ordered the sentences to be served consecutively to each other and to the sentence for the murder convictions for a total effective sentence of life plus seventy-five years.

On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions, noting that inconsistencies in the testimony of the State's witnesses raise reasonable doubt as to his guilt.

## II. Analysis

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no

reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to obtain a conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that a defendant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the defendant's prior relationship to the victim which might suggest a motive for the killing; (2) the defendant's declarations of intent to kill; (3) the defendant's planning activities before the killing; (4) the manner of the killing, including the defendant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the defendant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2).

Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and

(2).  Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon.  See Tenn. Code Ann. § 39-13-402(a)(1).  Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a).  A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent.  Tenn. Code Ann. § 39-14-103(a).  Serious bodily injury is defined as a bodily injury that involves:

> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement;
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or
>
> (F) A broken bone of a child who is twelve (12) years of age or less.

Tenn. Code Ann. § 39-11-106(a)(34).

A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

- 12 -

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Finally, Tennessee Code Annotated section 39-17-1307(c)(1) provides that "[a] person commits an offense who possesses a handgun and has been convicted of a felony."

In the light most favorable to the State, the proof adduced at trial revealed that Thompson called and sent text messages to the victim a few hours before the offense. A meeting was arranged at a gas station so that the victim could sell her some pills. The Appellant wanted go with Thompson and McNeil and said he would take the pills from the victim. As they were leaving the motel room, the Appellant picked up his gun from a table. Thompson thought the Appellant would use the gun to take pills from the victim. Thompson was driving the Appellant's car, and the Appellant told her to let him out at the Liberty Inn, which was just north of the gas station where Thompson had arranged to meet the victim. Thompson and McNeil continued to the gas station. When Marr and the victim arrived, Thompson and McNeil got into the back seat of the white Nissan Altima. Marr and the victim were unarmed. Thompson and the victim were discussing the transaction when the Appellant jumped into the back seat of the car. He pointed a gun at Marr and the victim and demanded that they "give him what they got." Thompson and McNeil got out and ran from the car. Marr and the victim attempted to leave, but the Appellant warned them not to exit the car. Marr and the victim initially told the Appellant that they had no money; however, when the Appellant began hitting the victim in the head with the butt of the gun and repeating his demands for money, Marr gave the Appellant approximately $90 to $95. The Appellant continued hitting the victim in the head with the gun and demanding money. After being hit in the head three to five times, the victim fought with the Appellant, and the Appellant shot the victim. Marr, the victim, and the Appellant immediately got out of the car. The Appellant ran away. Marr and the victim walked to the front of the car, where the victim collapsed. Shortly thereafter, police and paramedics arrived at the scene, and the paramedics pronounced the victim dead. After the shooting, the Appellant changed his clothes and disposed of the gun. Later that morning, upon learning of the victim's death, Thompson and McNeil asked the Appellant if he had killed the victim, and the Appellant responded that he did not know. Marr, Thompson, and McNeil identified the Appellant as the shooter. Harris and Jackson, who were at the gas pumps at the time of the offense, also identified the Appellant as the gunman. An autopsy revealed the victim died as a result of the gunshot wound.

The Appellant stipulated that at the time of the offenses, the Appellant had been convicted of five felonies involving the use or attempted use of violence and knew it was illegal for him to own, possess or handle a firearm.

- 13 -

We conclude that the foregoing proof is sufficient to sustain the Appellant's convictions.

### III. Conclusion

The judgments of the trial court are affirmed.

 

 

_____

NORMA MCGEE OGLE, JUDGE